IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF TYLER O.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TYLER O., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SARAH O., APPELLANT.

Filed September 10, 2019.    No. A-18-1120.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER E. KELLY, Judge. Reversed.

Nicole L. Cavanaugh, of Law Office of Nicole L. Cavanaugh, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Anthony Hernandez for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Sarah O., the natural mother of Tyler O., appeals from an order entered by the Separate Juvenile Court of Douglas County terminating her parental rights. For the reasons stated below, we reverse the decision of the juvenile court.

### BACKGROUND

On June 1, 2010, the county court for Adams County found Tyler (born in January 2002), was at risk of harm in his surroundings and immediate removal from his home was necessary for his protection. The Department of Health and Human Services (DHHS) was given temporary physical and legal custody of Tyler for placement, treatment, and care subject to further order of

the court. Tyler was returned to his mother's care on January 9, 2012, but the case remained open with ongoing supervision by DHHS. On February 24, 2012, Tyler's mother, Sarah, entered a no contest plea to a "no fault" petition.

On January 20, 2012, Tyler was again removed from his mother's home and he never returned to her custody during these proceedings. The record over time reveals that Tyler's removal was necessary due to inappropriate sexual contact between Tyler and a younger sibling. The younger sibling remained in Sarah's home and in her custody. Shortly after Tyler's removal, the matter was transferred from Adams County to Kearney County, Nebraska. While the case was docketed in Kearney County, Tyler was placed in a variety of structured environments, including Whitehall in Lincoln, an enhanced treatment group home for sex offenders, and the juvenile detention center in Lincoln while DHHS was looking for an extended family home.

In May 2017, Tyler was placed in an extended family home in Omaha. In December 2017, the case was transferred once again, this time to Douglas County. The transfer to Douglas County was at Sarah's request since by this time she had moved to Osborn, Kansas, and her home was closer to Omaha than to Minden. The case manager assigned to Tyler and his family out of Douglas County was Cheryl Cornwell, a family permanency specialist employed by PromiseShip.

During a permanency hearing held on August 14, 2018, the court found the permanency objective in Tyler's best interests was guardianship with self-sufficiency as a concurrent plan. Cornwell testified that no viable candidate had yet been identified to serve as Tyler's guardian. In its permanency order the court instructed DHHS to place Tyler in a therapeutic group home "which can deal with his sexualized behaviors, in or outside the State of Nebraska." This order meant finding yet another placement for Tyler since he needed a higher level of care than that provided in the extended family home.

Just prior to the August 2018 permanency hearing, the deputy Douglas County attorney filed a motion to terminate Sarah's parental rights alleging abandonment, neglect, torture, chronic abuse or sexual abuse, and placement of the minor child outside the parent's home for 15 out of the most recent 22 months. The motion to terminate Sarah's rights was scheduled for hearing on October 31, 2018. On October 23, Sarah sought to continue the termination hearing because she could not find child care for her other four children and the bus station for travel to Omaha was 2 hours from her home in Osborn, Kansas. The court denied the motion to continue. Sarah renewed her motion to continue prior to the start of the hearing to no avail. Counsel for Sarah then relayed the mother's request that she be allowed to participate by telephone. The court agreed and Sarah was connected to the proceedings but instructed to "listen and not be heard" by deploying the mute button on her phone. The court withheld judgment on whether it would allow Sarah to testify by phone.

At the start of the termination hearing the State offered as an exhibit a certified copy of the prior court orders from Adams County and Kearney County. The State then called the house parent from Tyler's extended family home placement who testified Tyler had been in his home for 17 months at the time of the hearing. The house parent testified that Tyler had become increasingly disruptive and aggressive in his home and his training was not sufficient to manage Tyler. The house parent was aware that at the time of the hearing DHHS was looking for another placement with more structure and more treatment. The house parent testified he had never met Sarah but he

had spoken to her during telephone visitation with Tyler on three separate occasions in October and November 2017 and on Tyler's birthday in January 2018. The house parent participated in a re-entry meeting after Tyler had been suspended from school and Sarah joined the meeting by telephone and was appropriate in her remarks. The house parent also participated in an individualized education plan meeting in January 2018 as did Sarah. The house parent did not provide Sarah with his address even though he believed he was allowed to share that information. The house parent testified Sarah did not send gifts, cards, money, or food to his home for Tyler.

The State then called Cornwell to testify about her role as Tyler's "on going case manager" in Douglas County. At the time Tyler's case was transferred to Douglas County, Cornwell had been on the job for 3 months. At the time of the termination trial, Cornwell had 14 months experience in her position as a "family permanency specialist." When Cornwell assumes responsibility for a new family she has a duty to familiarize herself with all the prior documentation, including court orders, prior case manager documentation, provider reports, and so forth. When a case is transferred from another county, Cornwell and her supervisor have a "transfer meeting" by telephone with the former DHHS case manager. Cornwell acknowledged she did not review any of the exhibit files maintained by the official court reporters in Buffalo County or Kearney County and at the time of the transfer she did not know what "level of visitation" Sarah was supposed to be having with Tyler. Cornwell had been advised by the prior case manager that the "mother doesn't come up" from Kansas. As a consequence, Cornwell did not offer Sarah any visits with Tyler between December 2017 and April 2018 when supervised visitation was ordered by the juvenile court.

Cornwell was the only witness the State called to render an opinion about whether termination of Sarah's parental rights was in Tyler's best interest. Cornwell testified she considers a variety of factors when reaching a recommendation opinion, including how long children and parents have been involved in services, parents' compliance with court orders, therapeutic notes and summaries, recommendations by providers, prior case plans and court orders, "some of the documentation" from prior placements, and observations of interactions between the parent and child. Cornwell testified any conclusion she reaches about whether or not to recommend termination of parental rights has been thoroughly vetted with her supervisor following a review of the case.

In her testimony, Cornwell is critical of what she characterizes as Sarah's lack of participation or failure to make any efforts toward reunification. It is Cornwell's position that in spite of Tyler's placement in specialized facilities, Sarah has a duty to demonstrate her desire to parent Tyler. Cornwell testified that even though the current permanency plan is guardianship, Sarah must ensure Tyler does not linger in foster care. Cornwell testified Sarah should have engaged more with the treatment providers or she could have relinquished her parental rights.

Cornwell detailed her interactions with Sarah from December 2017 through August 2018. Cornwell said she is only required to make "one contact per month with the parent" and her method of communication with Sarah was by telephone or text message. Cornwell described four telephone conversations with Sarah and 12 text messages during her tenure on the case. Cornwell testified her first telephone interaction with Sarah was unproductive, degenerating into yelling and cursing. Cornwell also testified Sarah participated in three family team meetings by telephone in

January, March, and April 2018. Cornwell described Tyler's contribution to the conversation during the March family team meeting when he said his mother and his siblings do not come to Nebraska to visit him because the State will take his siblings. Cornwell said Sarah re-directed Tyler as did she. Tyler and his four siblings had been removed from Sarah's care in a prior case in Adams County in 2005. It is not clear from the record when reunification was achieved in the former case but all of Tyler's siblings were in Sarah's custody at the time of the filing of this case on May 31, 2010.

Between January 2014 and March 2016 visitation had been "at the discretion of DHHS" as to type of visits, duration, and who is present. In March 2016 Tyler's foster mother at the time put a stop to all visits and DHHS was ordered to investigate. Visitation for Sarah was not addressed or ordered again until the juvenile court order in April 2018. Cornwell testified she never made a referral for a supervised visit because Sarah never asked for a visit.

Sarah appeared at a review and permanency planning hearing in Douglas County on August 14, 2018. Cornwell did not appear at that hearing due to illness. Sarah participated in a family mediation to address permanency subsequent to the August 14 hearing which Cornwell also missed due to the same illness. When Tyler's case was transferred to Douglas County the permanency plan was guardianship with a concurrent plan of reunification. Guardianship with a concurrent plan of self-sufficiency remained the plan in Douglas County and was the plan on the date of the termination hearing. At the time of the termination hearing, while DHHS was looking for yet another higher level of care for Tyler, Cornwell acknowledged that Tyler was not capable of being reunified with his mother at the time because of his behaviors. At the time of the termination trial, Tyler had been out of his mother's home for 80 months due to his increasing needs for specialized treatment. And the victim of Tyler's sexual perpetration was still in Sarah's home, which was a factor in why reunification was no longer the permanency plan.

Cornwell testified she has had some training regarding "sexual offender type" behaviors and she is aware the treatment protocol requires removal of the offender from the home if the victim is a sibling. Reunification with the sibling may occur after treatment and family therapy. At the time of the termination trial any family therapy which would have included Tyler had not yet been ordered. Sarah discussed her efforts in arranging for therapy for herself and her other children in Kansas during the mediation. The notes from the mediation included contact information for the therapist for the other children but Cornwell did not contact the therapist to see if Sarah had authorized an exchange of information. Cornwell also testified the mediation notes included a treatment placement option for Tyler near Sarah's home in Kansas but Cornwell did not follow up on Sarah's suggestion.

When asked if she had an opinion about whether Sarah's parental rights should be terminated, Cornwell answered in the affirmative. When asked for her opinion, Cornwell responded she believed it was in Tyler's best interests that Sarah's rights be terminated. When asked to state the basis for her opinion, Cornwell cited a "problematic relationship" between Tyler and Sarah as noted by a treating therapist; Tyler's "trouble in moving ahead therapeutically;" the fact that Sarah "just hangs on the phone" and listens during team meetings as evidence of "lack of desire to parent;" the fact that Sarah moved to Kansas; Sarah's failure to ask for any services designed to facilitate reunification; the length of time the case has been open and her telephone

interactions with Sarah. None of the court orders made a part of the record assign any rehabilitative services to Sarah aside from making visitation available to her at DHHS' discretion. The case manager testified she did not know what sort of visitation she was supposed to make available to Sarah at the time of the case transfer since the prior worker advised Sarah had moved to Kansas "and doesn't come up." Sarah was never ordered to correct any shortcomings in her parenting skills. Details of the "problematic relationship" between Sarah and Tyler are not included in the record. At the time of the termination trial Tyler was 17 years old and was in need of a higher level of care. Sarah did not testify during the termination hearing.

On November 1, 2018, the juvenile court entered an order terminating Sarah's parental rights. The order noted the State had proved all the elements of Neb. Rev. Stat. § 43-292(1), (2), (7), and (9) (Reissue 2016) by clear and convincing evidence and that it was in Tyler's best interests that Sarah's rights be terminated. The next permanency hearing was set for April 29, 2019.

## ASSIGNMENTS OF ERROR

Sarah complains the court erred in finding clear and convincing evidence that termination of her parental rights was in Tyler's best interests. Sarah also complains the court erred in finding clear and convincing evidence that Tyler comes within the meaning of § 43-292(1), (2), and (9).

## STANDARD OF REVIEW

Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014).

Termination of parental rights is warranted whenever one or more of the statutory grounds provided in § 43-292 are established. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010).

## ANALYSIS

### § 43-292(7)

Sarah does not contest the juvenile court's finding that as of the date of the termination hearing Tyler had been out of her care for 15 of the most recent 22 months. And the evidence is clear that since his removal in January 2012 through October 31, 2018, Tyler had been in out of home placements for 82 months. This passage of time would ordinarily persuade us termination of parental rights is in a child's interest but this is an unusual circumstance. Ongoing treatment at higher levels of care were required which meant out-of-home placement was ongoing. Nevertheless, since only one statutory ground for termination need be proved in order for parental

rights to be terminated, we find clear and convincing evidence establishing Tyler is a child as defined by § 43-292(7). See *In re Interest of Justin H. et al, supra.*

Best INTERESTS

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). In discussing the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has explained that "'[p]arental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.'" *Uhing v. Uhing*, 241 Neb. 368, 375, 488 N.W.2d 366, 372 (1992), quoting *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990). The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Ryder J., supra.*

The only evidence of what is in Tyler's best interests is that he needs ongoing treatment. At the time of the termination hearing DHHS was looking for a higher level of care for Tyler, a structured setting equipped to deal with his sexualized behaviors and physical aggression. Sarah suggested a placement near her home in Kansas which she believed met Tyler's needs but the case manager did not follow up on the idea.

None of the therapeutic reports or opinions relied on by the case manager in forming her opinion are part of the record reviewed by this court. Rather, any opinions contained in provider materials are filtered through the case manager who reports having only an infrequent and occasionally verbally abusive telephone relationship with Sarah. The case manager cites a therapist's opinion of a "problematic relationship" between Tyler and Sarah as some basis for her termination recommendation but she fails to detail specific facts which illustrate any problems. Tyler is a teenager with challenging behaviors which have also become too much for his trained extended family home house parent. And, there is no evidence of Tyler's wishes in the record aside from the inference to be drawn from his outburst during a family team meeting. Tyler seems to be concerned about the lack of visitation with his siblings and the case manager testified family therapy with a sibling victim is a component of the treatment protocol for sex offenders. If family therapy is required for rehabilitation, this court notes there is no evidence of any such order.

The record in this case spans 9 years and three counties. Our review of the evidence makes clear that Sarah lives some distance away from Tyler's current placement and travel to Omaha presents financial, logistical, and child care challenges. Sarah may be surly with the case manager

but this does not amount to some personal incapacity to parent or rise to the level of unfitness in our judgment, especially since Sarah participated in an individualized education plan meeting, family mediation, and made treatment suggestions which were ignored by the case manager. Furthermore, the original adjudication in this case did not find any fault on Sarah's part even though Tyler was at risk for some sort of harm.

Since Sarah did not testify it is not clear to us that she no longer desires a relationship with Tyler. And, until Tyler has more treatment at an as yet unidentified placement he is not in any position to achieve any permanency plan. Sarah has not been ordered to complete any rehabilitative services so any failure on her part is not the reason Tyler remains in foster care. See *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014). And although the juvenile court found that Sarah's "inaction, statements and sporadic contacts have for a significant period of time worked to the therapeutic disadvantage of the child," the limited record of evidence presented for this court's review does not provide any support for that finding. We also question what purpose the motion to terminate parental rights serves when Tyler was 17 years old at the time of the trial, more treatment was necessary, and an appropriate placement had not yet been found. Importantly, the record is devoid of evidence as to what potential harm a complete severance of Tyler's relationship with his mother might have on what has already been a difficult, prolonged, and apparently ineffective rehabilitation process in his mental health treatment.

## CONCLUSION

We find the State has not rebutted the presumption that an ongoing relationship between Tyler and Sarah is in his best interests nor has it proved by clear and convincing evidence that Sarah is unfit.

REVERSED.